United States District Court
Southern District of Texas
**ENTERED**
November 24, 2020
David J. Bradley, Clerk

# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS GALVESTON DIVISION

No. 3:18-cv-202

AARON STRIZ, TDCJ #00838215, PLAINTIFF,

v.

BRIAN COLLIER, *ET AL.*, DEFENDANTS.

## MEMORANDUM OPINION AND ORDER

JEFFREY VINCENT BROWN, UNITED STATES DISTRICT JUDGE.

Plaintiff Aaron Striz, an inmate in the Texas Department of Criminal Justice – Correctional Institutions Division ("TDCJ"), has filed a civil-rights complaint (Dkts. 11-1, 13-1) seeking relief under 42 U.S.C. § 1983.  Striz alleges that he is confined in administrative segregation at the Darrington Unit in violation of the Due Process Clause and other constitutional guarantees.  Striz proceeds *pro se* and *in forma pauperis*.

Defendants Michael Butcher, Kurtis Pharr, Lisa Davis, James Powers, and Myra Montez have filed a motion for summary judgment seeking dismissal of all claims against them (Dkt. 29).  Striz has responded (Dkt. 30).  Having considered the parties' briefing, the applicable law, and all matters of record, the court concludes that the motion for summary judgment should be granted and that

1/ 42

Striz's claims should be dismissed for the reasons set forth below.

## I.   __BACKGROUND__

Striz is a TDCJ prisoner housed at the Darrington Unit.[1]  In his original complaint, which was filed on June 28, 2018, he sued seventeen TDCJ officials (*see* Dkt. 1).  On August 29, 2019, the court granted Striz's request to file an amended complaint (Dkt. 16).[2]  The court also ordered that Striz could pursue relief based on the facts alleged in his proposed supplemental pleadings (*id.*).[3]  Next, the court ordered the following defendants to file an answer:  (1) Senior Warden Michael J. Butcher, Darrington Unit; (2) Major Kurtis D. Pharr, Darrington Unit; (3) Lisa M. Davis, Unit Classification Manager, Darrington Unit; (4) James Powers, Assistant Warden, Darrington Unit; and (5) Myra M. Montez, Classification Chief, Darrington Unit (Dkt. 17).[4]

---

[1]   Throughout this memorandum opinion, the court's citations to specific pages in the record refer to the pagination of docket entries on the court's electronic case-filing ("ECF") system.

[2]   In his proposed amended complaint, Striz included a First Amendment retaliation claim.  In the order granting the motion for leave to file the amended complaint, Striz's request to bring the retaliation claim was denied as futile (*see* Dkt. 16).  The motion for leave to amend was granted in all other respects (*id.*).

[3]   Striz's amended complaint is docketed at Docket No. 11-1 and his supplemental pleadings are docketed at Docket No. 13-1.

[4]   In addition to the above individuals whom the court ordered to answer the amended complaint, Striz also names the following individuals as defendants in the amended complaint:  (1) Bryan Collier, Executive Director of TDCJ; (2) (FNU) Carter, former Senior Warden, Estelle Unit; (3) (FNU) Brewer, former Senior Warden, Estelle Unit; (4) Christopher S. Lacox, Assistant Warden, Estelle High Security; (5) Cliff H. Prestwood, former Assistant Warden, Estelle High Security; (6) Bobby D. Rigsby, Major, Administrative Segregation, Estelle High Security; (7) Jody L. Vincent, Captain,

2/ 42

In short, Striz alleges that he has been confined in administrative segregation for more than 19 years and that TDCJ has no valid penological reason to continue to confine him there.[5]   He states that although he receives regular classification reviews, the hearings are a perfunctory sham.   He insists he has fulfilled all of TDCJ's requirements for release from administrative segregation and to disassociate from gang membership, but TDCJ continues to deny him release from administrative segregation, even though defendants admit that he is no longer a gang member.   He also asserts that TDCJ imposes conditions for release from administrative segregation beyond the requirements he has met, but which are impossible for him to meet.  Specifically, TDCJ mandates completion of the Gang Renouncement and Disassociation ("GRAD") program, but refuses to admit Striz to the program because of the Security Precaution Designator ("SPD") codes assigned to him.

The chronology that forms the basis of Striz's claims, as summarized below,

---

Administrative Segregation, Estelle High Security; (8) Kody R. Schurr, Captain, Administrative Segregation, Estelle High Security; (9) (FNU) Betcher, former Senior Warden, Robertson Unit; (10) (FNU) Siringi, former Assistant Warden, Robertson Unit; (11) the chairman of the State Classification Committee; (12) (FNU) Ray, State Classification Representative; (13) (FNU) Jones, State Classification Representative; (14) Kristen Gibson, State Classification Representative, and (15) Johnny Armstrong, State Classification Representative (Dkt. 11-1, at 2−6).  Although these fifteen individuals were also named as defendants, the court did not order service on them.  The claims against them will be addressed *infra* Part III.E.

[5]     At the time this lawsuit was filed in June 2018, Striz had been confined in administrative segregation for 17 years.   Now, Striz's confinement in administrative segregation has extended to 19 years.

is based on the events described in Striz's verified amended complaint and supplemental pleadings, records from Striz's underlying criminal convictions, and TDCJ records and documents submitted by the parties.

### A.      Chronology of Striz's Claims

In July 1998, Striz escaped from the Grimes County Jail (*see* Dkt. 11-1, at 7; Dkt. 29-4, at 41).  About a month later, Striz was captured and returned to the jail (*see* Dkt. 11-1, at 7; Dkt. 29-4, at 41).  On that same day he assaulted two jailers by stabbing one in the stomach and striking another on the head with a baton in an attempt to escape again (*see* Dkt. 11-1, at 7; Dkt. 29-1, at 16, 28; Dkt. 29-4, at 41).  As a result of these assaults, Striz was charged with and found guilty of two counts of aggravated assault on a public servant.  He was sentenced to life in prison.[6]  *See Offender Info. Search*, Tex. Dep't of Crim. Just., https://offender.tdcj.texas.gov/OffenderSearch/offenderDetail.action?sid=0585 4193 (last visited Nov. 12, 2020); (*see also* Dkt. 11-1, at 7; Dkt. 29-1).  Striz states that upon his transfer to TDCJ in September 1998, his initial classification was "minimum custody status" and that he was housed with the general prison population (Dkt. 11-1, at 7).  Despite this initial classification and placement, at some point Striz was assigned the SPD codes of *escape risk*, *hostage taker*, and

---

[6]      On this same date, Striz was also sentenced to life for aggravated robbery.  *See Offender Info. Search*, Tex. Dep't of Crim. Just., https://offender.tdcj.texas.gov/OffenderSearch/offenderDetail.action?sid=05854193 (last visited Nov. 12, 2020)

*staff assaultive* (*see id.*; Dkt. 29-4, at 25, 28, 30, 33).[7]

In August 2001, Striz was identified and "confirmed" as a member of a Security Threat Group ("STG")[8] based on his membership in a prison gang (Dkt. 11-1, at 6).  Due to his gang affiliation, Striz was removed from general population and placed in administrative segregation which, as described by Striz, is a form of long-term solitary confinement (*id.* at 7).  According to the TDCJ Classification Plan, administrative segregation is "a non-punitive, maximum custody status involving separation of an offender from general population for the purposes of maintaining safety, security, and order among general population offenders and correctional staff within the prison and the public" (Dkt. 29-3, at 9).  Striz states that his gang membership was the sole reason for his placement into administrative segregation (Dkt. 11-1, at 7).

---

[7]      According to the TDCJ Classification Plan, "Security Precaution Designator (SPD)" is a "code documented in an offender's record that identifies the offender as a special management risk" (Dkt. 29-3, at 15).  This designator is to be used for offenders who have a history of escape, taking hostages, assaulting staff, defeating security restraint devices, or are sentenced to life without parole (*id.*).  Striz was assigned the SPD codes of escape risk, hostage taker, and staff assaultive due to his assaults on the jailors at the Grimes County Jail and escape therefrom (*see* Dkt. 11-1, at 7).  Neither Striz nor the defendants, however, indicate in their briefing exactly when Striz was assigned the SPD codes.  Likewise, the record does not show when the SPD codes were assigned, only that they were assigned at some point during Striz's incarceration (*see* Dkt. 29-4, at 25, 28, 30, 33).  Based on Striz's verified amended complaint, it appears that these SPD codes were in place by at least July 2008 (*see* Dkt. 11-1, at 7 (explaining that Striz's SPD codes became eligible for possible removal in July 2008)).

[8]      The TDCJ Classification Plan defines "Security Threat Group (STG)" as "a group of offenders that has a well-organized structure, routinely uses violence, fear, and intimidation to further the group's prohibited activities, and that the TDCJ CID director determines poses a constant threat to the physical safety and security of staff, offenders, or the public" (Dkt. 29-3, at 16).

STG management officials advised Striz that for him to be released from administrative segregation and return to the general prison population, he must "disassociate with gang activity, renounce membership, and complete the Gang Renouncement and Disassociation (GRAD) program" (*id.*). To participate in the GRAD program, an inmate must meet certain criteria. These include, but are not limited to, having no major disciplinary cases of any kind for at least one year, maintaining "level one" status for at least one year, and not having any of the following SPD codes: *escape risk*, *hostage taker*, and *staff assaultive* (*see id.* at 21). The requirement concerning SPD codes is the most relevant to Striz's claims.

In July 2008, a "formal, intensive 2-year investigation process to verify [Striz's] renouncement and disassociation from all gang activity" began (*see id.* at 7).[9]   In July 2010, Striz's two-year investigation was finished and an "Attachment B Form/Disassociation Packet" was completed, which, according to Striz, officially documents in his classification file that he is no longer a gang member (*id.* at 7–8). Nevertheless, despite completion of the investigation and of the "Attachment B Form/Disassociation Packet," Striz's SPD codes  still prevented his participation in the GRAD program (*see id.* at 7–8, 21).  Striz states that his repeated requests to

---

[9]     Striz explains that the TDCJ policy governing SPD codes requires that before the codes may be reviewed for possible removal, the codes must remain in effect for a minimum of 10 years from the date of the incident prompting the assignment of such codes (Dkt. 11-1, at 7).  Since the incident prompting assignment of Striz's SPD codes occurred in 1998, STG management officials would not begin Striz's investigation period relating to the GRAD program until his SPD codes were eligible for possible removal in July 2008 (*id.*).

participate in the GRAD program have all been denied because of his SPD codes (*id.* at 7).

Striz complains that the reviews of his placement in administrative segregation amount to a perfunctory sham. In particular, Striz asserts that since July 2010, when the investigation to verify his disassociation from gang activity was complete, the defendants—"at every single periodic review hearing"—have "acknowledged that [his] Disassociation Packet is completed, . . . that he is no longer a gang member, and [that he] has done everything required of him, but due to active SPD codes he is not eligible for the GRAD program and therefore will remain in [administrative segregation], indefinitely, until he completes the GRAD program" (*id.* at 8). As an example, Striz states that while being housed at the Estelle Unit, he requested permission to participate in the "modified" GRAD program in which the requirement of no active SPD codes is not required (*id.* at 10). Striz states that the defendants at the Estelle Unit denied this request because, they maintained, the modified GRAD program is available only for seriously disabled or terminally ill offenders. But Striz contends that multiple offenders with "only minor disabilities" have completed the modified program (*see id.* at 10–11).

In March 2018, Striz was transferred to the Darrington Unit (*id.* at 11). Upon his arrival, he was taken before the Unit Classification Committee ("UCC") and was assigned to administrative segregation based on his status as a gang member (*id.*). Striz states that he explained to the UCC that he is no longer a gang member, and

that Pharr and the UCC case manager then examined his file, confirming that the "Attachment B/Disassociation Packet was complete and that he was no longer a gang member" (*id.*). According to Striz, Pharr then told him: "I can tell you what they are doing to you but you won't like it. They don't want you in population but they can't justify it with the SPD [c]odes, so they're using the STG tag to keep you in [administrative segregation]" (*id.*).

In mid-April 2018, another UCC hearing was held to "review [Striz's] SPD codes for possible deactivation" (*id.* at 11–12). Pharr, Davis, and a third unknown officer were present (*id.* at 12). Striz explained how his SPD codes prevent him from completing the GRAD program, that the incident which resulted in the placement of the SPD codes occurred 20 years ago at a county jail, that upon entering TDCJ he was assigned to minimum custody, and that since that time he has had no serious incidents (*id.*). Therefore, he averred, there is no reason not to deactivate the SPD codes (*id.*). Striz states that Pharr and Davis agreed. (*id.*). But then Pharr added that he "would not be the one to make that recommendation, nor did he have the authority [to do so]" (*id.*).

On April 16, 2018, Davis sent an email to Butcher, informing him of the result of Striz's hearing before the UCC:

Attn: Warden Butcher,

The offender below was seen on UCC [t]oday for possible removal of his SPD Codes (ES, HS & SA).

#00838215 Striz, Aaron

8/ 42

The committee voted to remain the SPD Codes, however, I am sending you the information for your decision. Below you will find a brief description as to why the SPD Codes was [sic] placed on the offender.

The offender escaped from the Grimes Cnty Jail on 7/8/98 and was captured back on 8/7/98 and was placed in Maximum Security Section for the remainder of his confinement. On 8/7/98, the jail staff was in the process of changing water bottles for four of the inmates & while the jailer was opening the door, Offender Striz, Aaron jumped up with a weapon. The jailer began to back-up to avoid being stabbed or cut. Another jailer attempted to stop the offender. At this time Offender Striz, Aaron took another jailer hostage w/a weapon to the throat. The offender stated he would kill her. The offender dragged her to the gate in attempt to let out another offender. At this time the Offender began to stab the officer in [the] stomach area by her belly button. The officer was released and he attempted to push his way thru the gate and stab another officer (jailer). Offender Striz, Aaron also took the jailer's baton and hit the jailer in the head with it. The offender was finally restrained and found that offender Striz and another offender had planned the escape.

We voted to remain him at this time due to the severity of the incidents. Please be advised that he has been denied approximately 4-time prior.

This is for your vote. Remain or remove

(Dkt. 29-4, at 41). Butcher responded to Davis's email: "The SPD codes will remain. If I need to override votes, I will" (*id.*).

On August 7, 2018, Striz appeared before the State Classification Committee ("SCC") for review (Dkt. 11-1, at 12). Present were Pharr, Montez, and Armstrong (*id.*). Striz explained to the SCC how the SPD codes kept him from completing the GRAD program, and he requested to either be released from administrative segregation or allowed to complete the program (*id.*). According to Striz, claims

that Armstrong responded by stating that: (1) the reason Striz was in administrative segregation was because of the escape and SPD codes; (2) he was misclassified when he entered TDCJ and should have "gone straight to [administrative segregation]"; (3) he will "never be allowed in population"; and (4) he was going to remain in administrative segregation "as an escape risk" (*id.*). Armstrong then noted that the sole basis of the decision to retain Striz in administrative segregation was for "confirmed STG/ABT" (*id.* at 13; *see* Dkt. 11-1, at 34−35).[10]

On February 28, 2019, Striz again appeared before the SCC (Dkt. 13-1, at 1). Striz complains that at this hearing, the defendants "abruptly and arbitrarily changed their excuse for continued indefinite confinement to administrative segregation" from "confirmed STG" to "escape risk, staff assaultive, [and] hostage taker" (*id.*).

Striz asserts that during his time in administrative segregation he has been deprived of the "basic necessities of life, such as, but not limited to" "human contact and social interaction, environmental and mental stimulus, physical activity, education and rehabilitation opportunities, work, contact visits, and other deprivations that place him at undue risk of long term and [permanent] psychological and physical harm due to the well[-]established detrimental effects

---

[10]      "ABT" refers to the Aryan Brotherhood Texas, the prison gang with which Striz was affiliated.

of long[-]term solitary confinement" (Dkt. 11-1, at 14).

### B.    Striz's Civil-Rights Complaint

Invoking 42 U.S.C. § 1983, Striz sues for violation of his rights under the Due Process Clause, the Equal Protection Clause, the Ex Post Facto Clause, and the Eighth Amendment (*see* Dkt. 11-1, at 13–17).  Except for Collier, whom he sues in his official capacity only, Striz sues all defendants in their individual and official capacities (*id.* at 2–6).  He seeks: (1) a declaratory judgment that his rights have been violated; (2) injunctive relief in the form of either (a) release from administrative segregation or (b) an order directing TDCJ to allow him to participate in the GRAD program and thus earn his release from administrative segregation; (3) punitive damages in the amount of $125 for each day he was wrongfully confined in administrative segregation; and (4) costs (*id.* at 17–18).

The defendants have filed a motion for summary judgment, arguing that all claims should be dismissed (*see* Dkt. 29).[11]  Striz has filed a response (*see* Dkt. 30).

## II.    <u>STANDARDS OF REVIEW</u>

### A.    *Pro Se* Pleadings

Striz proceeds *pro se*.  Courts construe pleadings filed by *pro se* litigants under a less stringent standard of review.  *Haines v. Kerner*, 404 U.S. 519, 520

---

[11]    Striz has also filed an instrument titled "Plaintiff's Reply to Defendants' Answer, Plaintiff's Motion to Admit, Plaintiff's Motion for Partial Summary Judgment" (*see* Dkt. 22).  In it, Striz mainly takes issue with the defendants' answer filed at Docket No. 21, the perceived deficiencies of which form the basis of his request for summary judgment (*see* Dkt. 22, at 8–9).  Where relevant, the court has considered Striz's arguments contained in this filing.

(1972) (per curiam).  Under this standard, "[a] document filed *pro se* is 'to be liberally construed,' . . . and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).  Nevertheless, *pro se* litigants are still required to explain or identify specific facts in support of their claims.  *See United States v. Stanford*, 805 F.3d 557, 572 (5th Cir. 2015) (citing *Yohey v. Collins*, 985 F.2d 222, 225 (5th Cir. 1993)).

## B.   Motion for Summary Judgment Under Rule 56

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Curtis v. Anthony*, 710 F.3d 587, 594 (5th Cir. 2013).  The initial burden falls on the movant to identify "those portions of the record it believes demonstrate the absence of a genuine issue of material fact."  *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law."  *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party."  *Id.*

at 477 (citing *Anderson*, 477 U.S. at 248).  The movant "may meet its burden by simply 'pointing to an absence of evidence to support the nonmoving party's case.'"  *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 544 (5th Cir. 2005) (quoting *Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 568 (5th Cir. 2003)).

Once the movant presents a properly supported motion for summary judgment, the burden shifts to the nonmovant to show with significant probative evidence the existence of a genuine issue of material fact.  *Hamilton*, 232 F.3d at 477.  The nonmoving party must present specific facts which show "the existence of a 'genuine' issue concerning every essential component of its case."  *Firman v. Life Ins. Co. of N. Am.*, 684 F.3d 533, 538 (5th Cir. 2012) (per curiam) (quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).  "Conclusory allegations" or "unsubstantiated assertions" do not meet the non-movant's burden.  *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008).

A reviewing court "must view the evidence introduced and all factual inferences from the evidence in the light most favorable to the party opposing summary judgment . . . ."  *Smith v. Reg'l Trans. Auth.*, 827 F.3d 412, 417 (5th Cir. 2016) (quoting *Hightower v. Tex. Hosp. Ass'n*, 65 F.3d 443, 447 (5th Cir. 1995)).  Factual controversies, however, are resolved in favor of the non-movant only when "both parties have submitted evidence of contradictory facts."  *Alexander v.*

*Eeds*, 392 F.3d 138, 142 (5th Cir. 2004).  In the absence of proof, a reviewing court will not assume that the nonmovant could or would prove the necessary facts.  *See McCallum Highlands, Ltd. v. Wash. Cap. Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995).  Further, a court is not obligated to comb the record in search of evidence that will permit a nonmovant to survive summary judgment.  *See Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006) (citing *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998)).

### C.    Qualified Immunity

The defendants have invoked the defense of qualified immunity, which protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"A public official is entitled to qualified immunity unless the plaintiff demonstrates (1) the defendant violated the plaintiff's constitutional rights and (2) the defendant's actions were objectively unreasonable in light of clearly established law at the time of the violation."  *Waganfeald v. Gusman*, 674 F.3d 475, 483 (5th Cir. 2012) (quoting *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011)).

After an official has asserted the defense of qualified immunity, the burden

is on the plaintiff to "rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law and that genuine issues of material fact exist regarding the reasonableness of the official's conduct." *Gates v. Tex. Dep't of Protective & Regul. Servs.*, 537 F.3d 404, 419 (5th Cir. 2008); *see also Voss v. Goode*, 954 F.3d 234, 238 (5th Cir. 2020) ("A good-faith assertion of qualified immunity alters the usual summary judgment burden of proof, shifting it to the plaintiff to show that the defense is not available.") (quoting *Melton v. Phillips*, 875 F.3d 256, 261 (5th Cir. 2017) (en banc)).

A reviewing court may address the two prongs of the qualified immunity analysis in any sequence, depending on the circumstances of the case at hand. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Heaney v. Roberts*, 846 F.3d 795, 801 (5th Cir. 2017). Given the circumstances of this case, the court proceeds to analyze the merits of Striz's constitutional claims.

## III.   **DISCUSSION**

### A.   **Due-Process Claim**

In asserting a due-process violation, Striz does not take issue with the frequency with which the defendants have reviewed his placement in administrative segregation; Striz admits that he regularly receives classification reviews (*see, e.g.*, Dkt. 11-1, at 9–13). Instead, Striz argues that since July 2010— when the Attachment B form first noted that he was no longer a gang member—all of his classification reviews have amounted to a perfunctory sham. He complains

that at each review, the defendants continue to use the confirmed STG tag to keep him in administrative segregation when they know that he is no longer a gang member. And they continue to use his SPD codes to justify their refusal to allow him to complete the GRAD program (*see id.* at 8, 13–14; Dkt. 30, at 2). The defendants argue that even if Striz can establish that administrative segregation deprives him of a liberty interest protected by the Fourteenth Amendment, he cannot show that the due-process protections in place are constitutionally inadequate (Dkt. 29, at 6–8). Evaluation of a due-process claim requires a two-part inquiry: first, determination of whether a liberty interest is implicated; and second, if a liberty interest is implicated, what process is due.

### 1.    Protectable Liberty Interest

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkerson v. Goodwin*, 774 F.3d 845, 851 (5th Cir. 2014) (quoting *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005)). A liberty interest sufficient to give rise to due-process protections "may arise from the Constitution itself . . . or it may arise from an expectation or interest created by state laws or policies[.]" *Wilkinson*, 545 U.S. at 221.

Generally, prisoners have no liberty interest in their custodial classification. *Wilkerson*, 774 F.3d at 852 (first citing *Hernandez v. Velasquez*, 522 F.3d 556, 562

(5th Cir. 2008); and then citing *Moody v. Baker*, 857 F.2d 256, 257–58 (5th Cir. 1988)).   Placement in administrative segregation is generally viewed as an ordinary, expected, and permissible incident of prison life.  *See, e.g.*, *Pichardo v. Kinker*, 73 F.3d 612, 612 (5th Cir. 1996) (holding that "absent extraordinary circumstances, administrative segregation . . . being an incident to the ordinary life as a prisoner, will never be a ground for a constitutional claim"); *Luken v. Scott*, 71 F.3d 192, 193 (5th Cir. 1995) (holding that "administrative segregation, without more, does not constitute a deprivation of a constitutionally cognizable liberty interest").

Nevertheless, assignment to administrative segregation can implicate a liberty interest when it is used in a way that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Wilkerson*, 774 F.3d at 853 (quoting *Hernandez*, 522 F.3d at 562).  The Supreme Court has identified three factors that are especially relevant to the question of whether confinement in segregation is atypical and significant: (1) the severity of the confinement restrictions in administrative segregation; (2) the duration of the confinement in administrative segregation; and (3) whether assignment to administrative segregation has any collateral consequences on the inmate's sentence.  *Wilkinson*, 545 U.S. at 223–24; *see also Wilkerson*, 774 F.3d at 853 (explaining that when determining whether an inmate's conditions of confinement implicate a liberty interest, a court is to consider "the nature of the more-restrictive

17/ 42

confinement *and* its duration in relation to prison norms and to the terms of the individual's sentence") (quoting *Harden-Bey v. Rutter*, 524 F.3d 789, 792 (6th Cir. 2008)).

Here, the court must determine whether Striz has established that his 19-year placement in administrative segregation implicates a liberty interest protected by the Due Process Clause. On the one hand, Striz has not made any argument or presented any evidence showing that the conditions of his confinement in administrative segregation are harsher than the conditions of inmates in the general population. *See Donaldson v. Ducote*, 112 F. App'x 329, 332 (5th Cir. 2004) (per curiam) (finding that inmate did not present a cognizable Fourteenth Amendment due-process claim when he did not "allege any facts that might support an inference that his confinement is excessively harsh when compared to the ordinary incidents of prison life"); *Rroku v. Cole*, 726 F. App'x 201, 205 (5th Cir. 2018) (per curiam) (finding that inmate did not show that he had a cognizable liberty interest with respect to his conditions of confinement when the inmate did not provide "evidence of detention norms with respect to the general population of detainees to which his conditions of confinement can be compared"). In this regard, Striz provides practically no details of his confinement in administrative segregation besides its length and a list of general grievances that he has suffered while in administrative segregation.[12] Nor does he describe life in

---

[12]    Specifically, in the section of the complaint in which he asserts his Eighth

18/ 42

general population so that the two types of confinement can be compared. Striz also has not alleged that his administrative-segregation classification affects the length of his sentence or his eligibility for parole, or deprives him of good-time credits. *See Sandin v. Conner*, 515 U.S. 472, 486–87 (1995) (stating that whether opportunity for parole is affected should be considered when deciding whether a liberty interest is implicated); *Wilkinson*, 545 U.S. at 224 (finding that one factor to consider when deciding whether an inmate's confinement creates a liberty interest is whether placement in such confinement disqualifies an otherwise eligible inmate for parole); *Bailey v. Fisher*, 647 F. App'x 472, 475 (5th Cir. 2016) (per curiam) (noting that courts are "particularly concerned when solitary confinement" affects an inmate's release date).

On the other hand, the length of Striz's 19-year confinement in administrative segregation is significant on its own. As explained by the Fifth Circuit, when determining whether an inmate has a liberty interest in his custodial classification, "courts employ a sliding scale, taking into account how bad the conditions are *and* how long they last." *Bailey*, 647 F. App'x at 476. "On such a sliding scale, truly onerous conditions for a brief period of time may not be

---

Amendment claim, Striz professes that while in administrative segregation he has been deprived "the basic necessities of life," "such as, but not limited to:" "human contact and social interaction, environmental and mental stimulus, physical activity, education and rehabilitation opportunities, work, contact visits, and other deprivations that place him at undue risk of long term and permanent psychological and physical harm due to the well established effects of long term solitary confinement" (Dkt. 11-1, at 14). This is the only description Striz provides of his confinement in administrative segregation.

atypical; less onerous conditions for an extended period of time may be." *Id.* The Fifth Circuit has "suggested that two and a half years of segregation is a threshold of sorts for atypicality[.]" *Id.* (citing *Wilkerson*, 774 F.3d at 855).

On the record before the court, it does not appear that Striz has met his summary-judgment burden as to whether his time in administrative segregation has given rise to a protectable liberty interest.  In that regard, while the duration of Striz's confinement in administrative segregation is notable, he has not alleged any specific facts regarding the conditions of that confinement, nor compared it to the conditions of confinement in the general population.  That said, even if Striz had shown that his confinement in administrative segregation gives rise to a liberty interest, he is not entitled to relief because he has received the process required.

### 2.   What Process Is Due

The second step of the analysis concerns whether an inmate was denied the appropriate level of process.  "Because the requirements of due process are 'flexible and cal[l] for such procedural protections as the particular situation demands,'" the Supreme Court has "generally declined to establish rigid rules and instead [has] embraced a framework to evaluate the sufficiency of particular procedures." *Wilkinson*, 545 U.S. at 224 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).  This framework, first set forth in *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976), considers three factors when analyzing what process is due:

> First, the private interest that will be affected by the official action; second, the risk of erroneous deprivation of such interest through the

> procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Wilkinson*, 545 U.S. at 224–25 (quoting *Matthews*, 424 U.S. at 335).  The court will consider each of these interests in turn.

### i.     *Private Interest*

The first *Matthews* factor, the private interest affected by the official action, is to be evaluated "within the context of the prison system and its attendant curtailment of liberties" because "the procedural protections to which [prisoners] are entitled are more limited than in cases where the right at stake is the right to be free from confinement at all." *Wilkinson*, 545 U.S. at 225.

At least one court has found that an inmate who had been held in solitary confinement for 20 years had a "significant private interest in leaving the restrictive conditions . . . and serving some part of his remaining life sentence outside of solitary confinement." *Incumaa v. Stirling*, 791 F.3d 517, 533–34 (4th Cir. 2015).  Although Striz has been held in administrative segregation for about the same amount of time as the plaintiff in *Incumaa*, the record in this case makes little mention of the type of conditions Striz has endured while in administrative segregation.  In *Incumaa*, the plaintiff was, among other things: (1) confined to his cell 24 hours a day on non-recreation and non-shower days; (2) permitted to leave his cell for recreation for only one hour about ten times per month; (3) allowed a

ten-minute shower just three times per week; (4) strip-searched every time he left his cell; (5) served smaller portions of food than inmates in the general population; and (6) denied the opportunity to receive mental-health treatment for his diagnosed mental-health condition. 791 F.3d at 521–22. In this case, Striz describes administrative segregation as a type of long-term solitary confinement and provides a generalized description of his time in administrative segregation. But the record otherwise contains no specific description of Striz's life in administrative segregation and it is unclear exactly how restrictive his conditions are. Even though both Striz and the plaintiff in *Incumaa* have been in administrative segregation for about the same amount of time, the court does not find that the private interest here is as significant as the private interest in *Incumaa*. In *Incumaa*, the plaintiff offered well-documented, specific evidence about the conditions of his confinement; Striz, in contrast, has provided almost none.

> ii.     *Risk of Erroneous Deprivation and Value of Additional or Different Procedures*

"The second factor addresses the risk of an erroneous placement under the procedures in place, and the probable value, if any, of additional or alternative procedural safeguards." *Wilkinson*, 545 U.S. at 225. In *Wilkinson*, the Supreme Court observed that notice of the factual basis for the government's decision and a "fair opportunity for rebuttal" are "among the most important procedural mechanisms for purposes of avoiding erroneous deprivations." *Id.* at 226 (first

citing *Greenholtz v. Inmates of Neb. Penal and Corr. Complex*, 442 U.S. 1, 15 (1979); then citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985); and then citing *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972)).

The *Wilkinson* Court, after finding a protectable liberty interest, held that the procedures for placement of inmates at an Ohio supermax prison were constitutionally adequate. *See id.* at 224–30. Under the procedures at issue in that case, inmates received notice of the factual basis leading to consideration for placement in the maximum-security prison, had a fair opportunity for rebuttal, enjoyed multiple levels of review with overturn authority at each level, and received a placement review within thirty days of the initial assignment to the supermax facility. *See id.* at 225–29. Although the *Wilkinson* Court found that these procedures satisfied due process, it stressed that "[w]here[,] [as here,] the inquiry draws more on the experience of prison administrators, and where the State's interest implicates the safety of other inmates and prison personnel, the informal, nonadversary procedures set forth in *Greenholtz*, 442 U.S. 1 [(1979),] and *Hewitt v. Helms*, [459 U.S. 460 (1983)], provide the appropriate model." *Id.* at 228–29. In both *Greenholtz* and *Hewitt*, due process was satisfied when an inmate received notice of the charges, an opportunity to be heard, and notice of any adverse decision. *See id.* at 229.

The TDCJ Classification Plan attached to the defendants' motion for summary judgment illuminates some of the policies and procedures regarding

23/ 42

both administrative-segregation decisions and placement, retention, and removal of SPD codes (*see generally* Dkt. 29-3).  The plan provides that the UCC is responsible for, among other things, "reviewing newly-assigned offenders" at the unit level and making all custody-designation assignments, except for designation assignments regarding administrative segregation and G1 custody (*id.* at 17, 34). In addition, the UCC can make recommendations to the SCC regarding the placement and removal of SPD codes (*id.* at 35).  The SCC, on the other hand, is charged with such duties as (1) conducting reviews and making decisions involving administrative-segregation offenders, including the assignment to, and release from, administrative segregation, and (2) conducting regularly scheduled review hearings for inmates assigned to administrative segregation (*id.* at 16, 37–38).  The SCC chairperson and vice-chairperson are tasked with making decisions regarding the removal of SPD codes from inmate records  (*id.* at 38).  Meanwhile, another committee, the Security Precaution Designator Review Committee ("SPDRC"), composed of the unit warden, the regional director, the SCC chairperson, and the deputy director for Support Operations, is "responsible for rendering decisions on UCC recommendations for the removal, placement, or retention of SPD codes in accordance with AD-04.11" (*id.* at 39).  And the unit warden, assistant warden, major, correctional supervisor(s), and chief of unit classification each has the individual authority—if authorized by the unit warden—to request that the SCC remove inmates from administrative segregation (*id.* at 39–40).

Here, the record supports that Striz (1) is provided with advance notice of the review hearings, (2) is provided an opportunity to speak at the hearings, (3) can submit written statements from witnesses, (4) can submit other documentary evidence, and (5) is given notice of the factual basis for the review committees' decisions (*see* Dkt. 11-1, at 10–13; *see e.g.,* Dkt. 29-4, at 15 (Review Hearing Record for the annual STG review indicates that Striz was informed in advance that he had a right to attend the meeting, to make a statement, to submit written statements from witnesses, and to submit other documentary evidence); Dkt. 29-4, at 22–23 (Review Hearing Record from the SCC explaining that the SCC's decision was based on "escape risk," "staff assaultive," "hostage taker," and that Striz was notified of the decision)). Striz does not dispute that he receives regular thirty-day reviews of his unit classification, six-month reviews by the SCC, and yearly reviews of his STG designation (*see* Dkt. 11-1, at 9–13; *see generally* Dkt. 29-4). In addition to these procedural mechanisms, additional potential safeguards include the UCC recommending the removal of SPD codes and for certain TDCJ officials and officers—if authorized by the unit warden—to request the removal of inmates from administrative segregation.[13]

---

[13]  In his complaint, Striz refers to two UCC classification reviews (one in March 2018 and the other in April 2018) at which certain defendants allegedly made remarks supporting his contention that though they know the original reason for his placement in administrative segregation (gang membership) is no longer valid, they continue to keep him there anyway (*see* Dkt. 11-1, at 11–12). Even accepting as true Striz's assertion that defendants acknowledged at these reviews that he is no longer a gang member and that there was no reason not to deactivate the SPD codes, these remarks were allegedly made at UCC reviews (*see id.*). The UCC does not determine changes in administrative

Striz argues that in 2019, after he filed this lawsuit, the defendants arbitrarily changed the reason he was assigned to administrative segregation from "gang membership" to "escape risk," "staff assaultive," and "hostage taker" (*see* Dkt. 13-1, at 1). Yet even though the defendants' stated justification for assigning him to administrative segregation may have changed, it is not as if the new justification came out of the blue. It is undisputed that at all times relevant to Striz's claims (from July 2010 to present), he has been assigned the SPD codes of *staff assaultive*, *hostage taker*, and *escape risk*.[14] And although Striz believes that he should be allowed to participate in the GRAD program because he is no longer a gang member, the fact remains that these three SPD codes preclude his participation (*see* Dkt. 11-1, at 21).

---

segregation custody designation (*see* Dkt. 29-3, at 34); instead, the UCC may only make recommendations, "when appropriate," to the SCC regarding the placement and removal of SPD codes (*id.* at 35). It is the SCC that makes decisions involving release from administrative segregation (*id.* at 37). Moreover, the SPDRC renders decisions on UCC recommendations for the removal, placement, or retention of SPD codes "in accordance with AD-04.11" (*id.* at 39), and it is the SCC chairperson and vice-chairperson specifically who make decisions regarding the removal of SPD codes from inmates' records (*id.* at 38). Notably, the SCC also has "the authority to override UCC decisions in order to maintain the safety, security, and orderly management of offenders" (*id.* at 38). Thus, even if it were true that these UCC members told Striz that they thought there was no reason for his SPD codes to be deactivated, the decision was not theirs to make.

[14]    Striz asserts that defendants changed the reason for his placement in administrative segregation from confirmed STG to *escape risk*, *staff assaultive*, and *hostage taker* during his SCC review in February 2019 (*see* Dkt. 13-1, at 1). Striz, however, has not pointed to any policy that states that TDCJ cannot change the basis for an inmate's placement in administrative segregation. As long as an inmate receives notice of the basis for placement in administrative segregation, an opportunity to be heard, periodic reviews, and notice of the factual basis for any adverse decision—all of which Striz has received, as discussed above—due process has been satisfied.

Despite Striz's disagreement with the GRAD program's participation requirements, the record reflects that he is given advance notice of the review hearings, is provided an opportunity to be heard during the hearings, can submit written statements from witnesses and other documentary evidence, and is informed of the factual basis of the review committees' decisions (*see* Dkt. 11-1, at 10–13; Dkt. 29-4, at 15, 22–23).  Furthermore, TDCJ policies allowing the UCC to make recommendations to the SCC regarding the placement and removal of SPD codes, as well as the ability of the unit warden and others to make requests to the SCC regarding an inmate's removal from administrative segregation, provide additional procedural protections.   The court finds that the procedural mechanisms in place properly reduce the risk of erroneous placement and that this factor weighs in the defendants' favor.

### iii.    Government's Interest

The third *Matthews* factor also weighs against Striz.  In the context of prison management, the government's interest in avoiding the burdens of additional procedural requirements is a "dominant consideration."  *Wilkinson*, 545 U.S. at 225 (explaining that a state's "first obligation must be to ensure the safety of guards and prison personnel, the public, and the prisoners themselves") (citation omitted).  The state has a significant interest in managing its prison facilities, maintaining order among its personnel and inmates, and preserving scarce resources.  And a court "must give substantial deference to prison management

decisions before mandating additional expenditures for elaborate procedural safeguards . . . ."  *Id.* at 227–28.

This factor is especially relevant here, as the SPD codes assigned to Striz— based on his escaping the Grimes County Jail and violently assaulting two jailers— are directly related to prison safety.  "It is well settled that '[p]rison officials must have broad discretion, free from judicial intervention, in classifying prisoners in terms of their custodial status.'"  *Wilkerson v. Maggio*, 703 F.2d 909, 911 (5th Cir. 1983) (quoting *McGruder v. Phelps*, 608 F.2d 1023, 1026 (5th Cir. 1979)). "[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform."  *Procunier v. Martinez*, 416 U.S. 396, 405 (1974). Where a state penal system is involved, federal courts have "additional reason to accord deference to the appropriate prison authorities." *Turner v. Safely*, 482 U.S. 78, 85 (1987) (citing *Procunier*, 416 U.S. at 405).  This factor strongly favors the defendants.

In light of all three *Matthews* factors, the process afforded Striz regarding his continued placement in administrative segregation is constitutionally adequate.  Specifically, Striz (1) is provided with advance notice of the review hearings, (2) is provided an opportunity to speak at the hearings, (3) can submit written statements from witnesses, (4) can submit other documentary evidence, and (5) is given notice of the factual basis for the review committees' decisions. The government's interest in ensuring the safety of guards and prison personnel,

the public, and the prisoners themselves is especially weighty here, and Striz has not shown that any private interest of his tips the balance. Thus, Striz has failed to establish a constitutional violation, and the defendants are entitled to qualified immunity on Striz's due-process claim.

### B.    Equal-Protection Claim

Striz also asserts that the defendants have violated his rights under the Equal Protection Clause by intentionally treating him differently than similarly situated inmates with no rational basis for doing so. Specifically, he maintains that other inmates with violent felony convictions have been allowed to complete the GRAD program or have been released from administrative segregation without completing it (*see* Dkt. 11-1, at 15; Dkt. 30, at 5–6). The defendants disagree, arguing that Striz does not have a cognizable equal-protection claim (Dkt. 29, at 9–11).

"The Equal Protection Clause of the Fourteenth Amendment is 'essentially a direction that all persons similarly situated should be treated alike.'" *Wood v. Collier*, 836 F.3d 534, 538 (5th Cir. 2016) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). Here, Striz does not contend that he is a member of a protected class; rather, he claims that he was singled out. "An equal protection claim that is premised on differential treatment but not based on membership in a suspect class or the infringement of a fundamental right may be cognizable as a so-called 'class of one.'" *Id.* at 539 (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). To maintain a "class of one" equal-protection claim, Striz must show that

(1) he has been intentionally treated differently from others similarly situated, and (2) there is no rational basis for the difference in treatment. *Integrity Collison Ctr. v. City of Fulshear*, 837 F.3d 581, 586 (5th Cir. 2016) (citing *Olech*, 528 U.S. at 564). "Under rational basis review, differential treatment must be upheld against [an] equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Wood*, 836 F.3d at 539 (quoting *Hines v. Aldredge*, 783 F.3d 197, 202–03 (5th Cir. 2015)).

In support of his equal-protection argument, Striz claims that, like himself, three named inmates with "violent" felony convictions had SPD codes for prior escapes and the only reason those inmates were in administrative segregation was because they were confirmed STG members (Dkt. 11-1, at 15; Dkt. 30, at 5). Striz states that upon completion of the "Attachment B" forms, the SPD codes for these inmates were deactivated and they were allowed to complete the GRAD program (Dkt. 11-1, at 15). In addition, Striz provides another example of an inmate who, after an investigation was conducted but without completing the GRAD program, was permitted to return to the general prison population (*id.*).

Striz asserts that these inmates are sufficiently similarly situated to him to support a cognizable equal-protection claim. But the court disagrees. As the defendants point out, Striz does not allege that the comparators share his criminal history, convictions for crimes with similar degrees of violence, his institutional record, his mental and physical condition, his age, or his perceived risk of escape.

Nor does Striz allege that the defendants were involved in the classification of these comparators. Merely asserting that an inmate is similarly situated because he was also convicted of a violent felony and was assigned the same SPD codes, without more, does not meet a plaintiff's burden of showing that he is similarly situated to other inmates. *See, e.g.*, *Stevenson v. La. Bd. of Parole*, 265 F.3d 1060, 2001 WL 872887, at *1 (5th Cir. July 11, 2001) (per curiam); *Farr v. Rodriguez*, 255 F. App'x 925, 926–27 (5th Cir. 2007) (per curiam).

Moreover, any disparity in treatment between Striz and the inmates he identifies does not violate his right to equal protection so long as it rationally furthers a legitimate state interest. Safety and institutional security are legitimate penological interests. *See Washington v. Harper*, 494 U.S. 210, 225 (1990) ("There can be little doubt as to both the legitimacy and the importance of the governmental interest presented here. There are few cases in which the State's interest in combating the danger posed by a person to himself and others is greater than in a prison environment, which, 'by definition,' is made up of persons with 'a demonstrated proclivity for antisocial criminal, and often violent, conduct.'") (quoting *Hudson v. Palmer*, 468 U.S. 517, 526 (1984) (citations omitted)). Accordingly, courts must defer to prison administrators' adoption and implementation of policies needed to ensure order and security. *See Oliver v. Scott*, 276 F.3d 736, 745 (5th Cir. 2002) (explaining that prison administrators' judgments regarding institutional security are accorded "great deference"). Here, Striz has not demonstrated that his

classification lacks the requisite rational relation to a legitimate governmental objective—that is, prison safety and security.

Moreover, Striz is challenging a prison-classification matter that encompasses discretionary decision making based on a subjective, individualized assessment. In such a case, it is doubtful he can even bring a cognizable class-of-one equal-protection claim.  In *Engquist v. Oregon Department of Agriculture*, the Supreme Court considered "forms of state action . . . which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments."  553 U.S. 591, 603 (2008).  The aggrieved party in *Engquist* was a government employee who brought a class-of-one claim alleging that her termination violated the Equal Protection Clause.  *Id.* at 595.  After the jury found for the plaintiff, the state appealed and the Ninth Circuit reversed.  *Id.* at 596.  In affirming the Ninth Circuit, the Supreme Court recognized that although governmental discretion sometimes disguises impermissible discrimination, in the case at bar "treating like individuals differently is an accepted consequence of the discretion granted," and allowing equal-protection claims on such grounds "would be incompatible" with that discretion.  *Id.* at 603, 604.

Although *Engquist* concerns an adverse-employment decision, many courts have applied the *Engquist* Court's rationale in the prison context, concluding that class-of-one equal-protection claims are not viable when based on individualized assessments of inmates.  *See, e.g.*, *Howard v. Koeller*, 756 F. App'x 601, 604 (7th Cir.

32/ 42

2018) (holding that inmate's class-of-one equal-protection claim failed because it challenged discretionary decision making); *Dawson v. Norwood*, No. 1:06-cV914, 2010 WL 2232355, at *2 (W.D. Mich. June 1, 2010) (citation omitted) (dismissing inmate's class-of-one equal-protection claim that he was treated differently than other prisoners in administrative segregation because "the class-of-one equal[-]protection theory has no place in the prison context where a prisoner challenges discretionary decisions regarding security classifications and prisoner placement); *Upthegrove v. Holm*, No. 09-CV-206, 2009 WL 1296969, at *1 (W.D. Wis. May 7, 2009) (citations omitted) (finding that inmate's class-of-one equal-protection claim was properly dismissed "in light of current rulings suggesting that 'class-of-one' equal[-]protection claims are not cognizable in such an individualized and discretionary setting as the prison setting"); *cf. Rowe v. Cuyler*, 534 F. Supp. 297, 301 (E.D. Pa. 1982) ("[N]o two prisoners, being different human beings, will possess identical backgrounds and characters.  Indeed, it is difficult to believe that any two prisoners could ever be considered 'similarly situated' for the purpose of judicial review on equal[-]protection grounds of broadly discretionary decisions because such decisions may legitimately be informed by a broad variety of an individual's characteristics."), *aff'd*, 696 F.2d 985 (3d Cir. 1982); *Faruq v. McCollum*, Civil Action No. 11-5987 (JBS), 2013 WL 3283942, at *5 (D.N.J. June 25, 2013) ("[W]ith regard to security level and placement decisions that are based on individual factors and histories, it is hard to imagine that any inmate would be considered similarly situated

[in an equal-protection claim]").

Viewing the competent summary-judgment evidence in the light most favorable to Striz, he has raised no genuine fact issue as to whether he was intentionally, and without rational basis, treated differently from other similarly situated inmates.   Accordingly, as Striz cannot establish class-of-one equal-protection discrimination, the defendants are entitled to qualified immunity and summary judgment on this claim.

### C.    Eighth Amendment Claim

Striz asserts that his nineteen-year confinement in administrative segregation, "for no valid reason, using an excuse [the defendants] know to be invalid, and with no prospect of release from [administrative segregation]," amounts to cruel and unusual punishment in violation of the Eighth Amendment (*see* Dkt. 30, at 6).  Striz asserts that during his time in administrative segregation, he has been deprived of the "basic necessities of life, such as but not limited to" "human contact and social interaction, environmental and mental stimulus, physical activity, education and rehabilitation opportunities, work, contact visits, and other deprivations that place him at undue risk of long term and permanent psychological and physical harm due to the well established detrimental effects of long term solitary confinement" (Dkt. 11-1, at 14).  The defendants argue that Striz has no Eighth Amendment claim because he has made no specific allegations as to how his housing assignment amounts to cruel or unusual punishment (*see* Dkt. 29,

34/ 42

at 8–9).

"The unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Hope v. Pelzer*, 536 U.S. 730, 737 (2002) (cleaned up). And among those forbidden "unnecessary and wanton inflictions of pain are those that are totally without penological justification." *Id.* It is true that "[c]onfinement . . . in an isolation cell is a form of punishment subject to scrutiny under Eighth Amendment standards." *Hutto v. Finney*, 437 U.S. 678, 685 (1978). But so long as the confinement is not cruel and unusual, "restrictive and even harsh" conditions "are a part of the penalty that criminal offenders pay for their offenses against society." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Moreover, "administrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration." *Hewitt v. Helms*, 459 U.S. 460, 468 (1983). Nevertheless, although the Supreme Court has made clear that "the Constitution does not mandate comfortable prisons," prison officials must still ensure that "inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson*, 468 U.S at 526–27).

An inmate must establish two elements for a successful Eighth Amendment challenge. "First, he must demonstrate that the alleged deprivation was objectively serious, exposing him to a substantial risk of harm and resulting in the denial of

35/ 42

the minimal civilized measure of life's necessities." *Arenas v. Calhoun*, 922 F.3d 616, 620 (5th Cir. 2019) (cleaned up).  Second, an inmate must show that the official possessed a "sufficiently culpable state of mind." *Palmer v. Johnson*, 193 F.3d 346, 352 (5th Cir. 1999) (quoting *Farmer*, 511 U.S. at 834).  "In prison conditions cases, that state of mind is one of deliberate indifference to inmate health or safety." *Id.* at 352 (citing *Farmer*, 511 U.S. at 834).

Here, as the defendants point out and as the court sets out above, Striz does not make any specific allegations about the conditions of his confinement in administrative segregation, other than protesting his placement therein.  Besides describing administrative segregation as a "form of long term solitary confinement" (Dkt. 11-1, at 7), Striz does not describe the conditions of his actual confinement in administrative segregation, nor does he provide a comparison of how it differs from being housed within the general prison population.  He does not allege that his housing was in some way inadequate or that his safety was at risk; nor does he claim that he was deprived of food, clothing, or medical care.  Importantly, neither does Striz allege—nor does the record reveal—that he has ever been placed at "substantial risk of serious harm."  Instead, Striz makes general allegations that he has been deprived of human contact and social interaction, environmental and mental stimulus, and physical activity, among other general alleged hardships.  But such vague and conclusory allegations, unaccompanied by specific facts, are insufficient to withstand a motion for summary judgment.  *See*

*Delta & Pine Land Co.*, 530 F.3d at 399; *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995).

Moreover, Striz's claim also fails because he does not show that the defendants were deliberately indifferent to his health or safety.  *See Hernandez*, 522 F.3d at 561 (holding that inmate could not show deliberate indifference because there was no evidence that he was ever placed at substantial risk of serious harm); *Colgrove v. Williams*, 105 F App'x 537, 538 (5th Cir. 2004) (per curiam) (holding that inmate did not establish an Eighth Amendment violation when he had been kept in administrative segregation for more than a decade because he did not show that such confinement deprived him of the "minimal measures of life's necessities" or that prison officials acted with deliberate indifference) (citing *Harper v. Showers*, 174 F.3d 716, 719 (5th Cir. 1999)).  Accordingly, the defendants are entitled to qualified immunity, and their motion for summary judgment is granted as to the Eighth Amendment claim.

## D.    Ex Post Facto Claim

Striz also asserts that the defendants have violated the Ex Post Facto Clause. Construing his argument liberally, Striz seems to contend that because the SPD code policy—which dictates that any inmate with active SPD codes is prohibited from attaining minimum custody status and, by extension, is not able to complete the GRAD program—was enacted after Striz was already assigned to administrative segregation due to gang membership, such policy violates the Ex

Post Facto Clause (*see* Dkt. 11-1, at 7–8, 16–17).  According to Striz, the defendants are using the application of the SPD codes assigned to him as a "pretext" for keeping him in administrative segregation (*id.* at 16).  The defendants argue that because TDCJ has the authority to classify and reclassify inmates, any change in a prisoner's classification does not amount to a change in the "law" for the purposes of an ex post facto challenge; therefore, any claim based on a violation of the Ex Post Facto Clause should be dismissed (Dkt. 29, at 11–12).

 "Imposition of punishment more severe than that assigned when a criminal act occurred is a violation of the Constitution's prohibitions on ex post facto laws." *Warren v. Miles*, 230 F.3d 688, 692 (5th Cir. 2000) (citing U.S. Const. art. I, § 9, cl. 3 and *Collins v. Youngblood*, 497 U.S. 37, 42 (1990)).  "For an ex post facto violation to occur, two elements must be present:  (1) a law must be retrospective, that is, it must apply to events occurring before its enactment, and (2) the new law must create a sufficient risk of increasing the punishment attached to the defendant's crimes." *Warren*, 230 F.3d at 692 (citations omitted); *see also Garner v. Jones*, 529 U.S. 244, 255–56 (2000) (focusing on whether a law challenged on ex post facto grounds creates a significant risk of prolonging an inmate's incarceration); *Lynce v. Mathis*, 519 U.S. 433, 444 (1997) (explaining that ex post facto analysis should focus on the "effect of the law on the inmate's sentence"); *Warren*, 230 F.3d at 692 (explaining that when evaluating an alleged violation of the ex post facto doctrine, the court must analyze the level of risk that an inmate's

38/ 42

prison stay will be longer because of a change in the law that applies retroactively). Moreover, changes to laws that create only a speculative or attenuated risk of affecting a prisoner's actual term of confinement are insufficient to establish an ex post facto violation. *See Hallmark v. Johnson*, 118 F.3d 1073, 1078 (5th Cir. 1997); *Casterline v. Thaler*, 494 F. App'x 500, 502–03 (5th Cir. 2012) (per curiam).

Striz's claim based on a violation of the Ex Post Facto Clause fails for two reasons. First, Striz does not allege that his placement in administrative segregation increased the length of his punishment; instead, he claims only that the SPD code policy was enacted after his placement in administrative segregation and that the SPD codes are being used as a "pretext" to keep him there. But under such circumstances, there has been no ex post facto violation. *See, e.g.*, *Sims v. Epps*, 96 F.3d 1444, 1996 WL 512003, at *1 (5th Cir. 1996) (per curiam) ("Assuming that the new prison policy which allows prison officials to extend solitary confinement is a law within the meaning of the Ex Post Facto Clause, the application of the policy to [the inmate] did not violate the Ex Post Facto Clause because it did not make his punishment more burdensome by increasing the length of his term of imprisonment . . . .") (citing *Collins*, 497 U.S. at 42); *Welch v. Epps*, 103 F. App'x 828, 2004 WL 1690139, at *1  (5th Cir. 2004) (per curiam) (holding that "points system" that resulted in inmate receiving a negative custodial classification did not violate the ex post facto clause because a "mere change in custodial status" does not amount to an "increase" in the "measure of punishment"

for ex post facto purposes) (citing *Garner v. Jones*, 529 U.S. 244, 249–50 (2000)).

As explained by the Fourth Circuit, matters relating to prison management that do

not extend an inmate's sentence—such as reclassifying an inmate's custodial

status—do not violate the prohibition on ex post facto laws:

> Changes in a prisoner's location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and denials of privileges—matters which every prisoner can anticipate are contemplated by his original sentence to prison— are necessarily functions of prison management that must be left to the broad discretion of prison administrators.
>
> It is precisely because reasonable prison regulations, and subsequent punishment for infractions thereof, are contemplated as part of the sentence of every prisoner, that they do not constitute additional punishment and are not classified as *ex post facto*. Moreover, since a prisoner's original sentence does not embrace a right to one set of regulations over another, reasonable amendments, too, fall within the anticipated sentence of every inmate.

*Jones v. Murray*, 962 F.2d 302, 309–10 (4th Cir. 1992) (first paragraph quoting

*Gaston v. Taylor*, 946 F.2d 340, 343 (4th Cir. 1991) (en banc)).

Second, and relatedly, "it is well established that the *Ex Post Facto* Clause

applies only to changes in the law through legislative acts, not to changes in policy

or to new interpretations of existing laws." *Turner v. Johnson*, 46 F. Supp. 2d 655,

673 (S.D. Tex. 1999) (citations omitted); *see also Creel v. Kyle*, 42 F.3d 955, 958

(5th Cir. 1995) ("The Supreme Court has held that procedural changes, even if they

work to the disadvantage of a criminal defendant, do not violate the *Ex Post Facto*

Clause.") (citing *Collins*, 497 U.S. 37); *Ward v. Dretke*, C-05,464, 2006 WL

1291824, at *3 (S.D. Tex. May 8, 2006) (observing that the Fifth Circuit has held

that guidelines promulgated by a regulatory body cannot violate the prohibition against ex post facto laws) (citing *Sheary v. U.S. Parole Comm'n*, 822 F.2d 556, 558 (5th Cir. 1987)).  Accordingly, any change to the "SPD code policy" presents no ex post facto issue.  *See Hill v. Davis*, No. 2:18-cv-230, 2018 WL 9413236, at \*3 (S.D. Tex. Dec. 12, 2018) ("[B]ecause the TDCJ has the authority to classify and reclassify inmates, any 'change in [a prisoner's] classification does not amount to a change in the 'law' for purposes of an *ex post facto* challenge.'") (quoting *Ward*, 2006 WL 1291824, at \*3), *report and recommendation adopted*, No. 2:18-cv-230, 2019 WL 3936006 (S.D. Tex. Aug. 19, 2019).  The defendants' motion for summary judgment is granted as to Striz's ex post facto claim.

### E.   Claims Against Unserved Defendants

As outlined above, Striz has asserted due-process, equal-protection, Eighth Amendment, and ex post facto claims against fifteen other defendants who have not been served.[15]  The court notes that Striz's claims against these defendants fail for the same reasons set forth above.

The Fifth Circuit has recognized that when one defending party establishes that the plaintiff has no cause of action, this defense generally inures to the benefit of other similarly situated defendants.  *Lewis v. Lynn*, 236 F.3d 766, 768 (5th Cir. 2001)).  As analyzed above, Striz has not demonstrated a genuine fact issue that would defeat summary judgment as to Butcher, Pharr, Davis, Powers, and Montez.

---

[15]    See *supra* note 4 for the defendants named in this action who have not been served.

41/ 42

Hence, the other fifteen defendants who are similarly situated to Butcher, Pharr, Davis, Powers, and Montez, but who did not join the motion for summary judgment because they had not been served, are nevertheless entitled to benefit from that motion.   Accordingly, Striz's claims against the remaining fifteen defendants are dismissed with prejudice as well.

IV.   **CONCLUSION**

For the reasons stated above, the court **ORDERS** as follows:

1.      The motion for summary judgment (Dkt. 29) filed by Defendants Michael J. Butcher, Kurtis D. Pharr, Lisa M. Davis, James Powers, and Myra M. Montez is **GRANTED**;

2.      Plaintiff Aaron Striz's Motion to Admit and Motion for Partial Summary Judgment (Dkt. 22) are **DENIED**; and

3.      All of plaintiff Aaron Striz's claims are **DISMISSED with prejudice**.

The clerk will provide a copy of this order to the parties.

Signed on Galveston Island this __24th__ day of ____November____, 2020.

_____
JEFFREY VINCENT BROWN
UNITED STATES DISTRICT JUDGE

42/ 42